IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TOMMY BROWN,<br><br>                    Plaintiff,<br><br>        v.<br><br>RE/MAX, LLC.,<br><br>                    Defendant. | Civil Action No.<br><br>COMPLAINT FOR INJUNCTION |

**COMPLAINT FOR PERMANENT INJUNCTION**
**REQUIRING CHANGES TO CORPORATE POLICY AND THE ELIMINATION OF**
**DIGITAL ACCESS BARRIERS PURSUANT TO 42 U.S.C. § 12188(a)(2)**

Tommy Brown ("Plaintiff") seeks a permanent injunction requiring a change in RE/MAX, LLC's ("Defendant" or "RE/MAX") corporate policies to cause RE/MAX's websites to become, and remain, accessible to individuals with visual disabilities. In support thereof, Plaintiff respectfully asserts as follows:

**INTRODUCTION**

1.      "Being unable to access websites puts individuals at a great disadvantage in today's society, which is driven by a dynamic electronic marketplace and unprecedented access to information." U.S. Dep't of Justice, Statement of Eve L. Hill before the Senate Comm. on Health, Educ., Labor & Pensions, at 3 (May 14, 2013).[1]

2.      Tommy Brown went blind when he was just 8-years old. Today, he uses a screen reader to navigate the Internet.

---

[1]  Available at https://www.justice.gov/iso/opa/ola/witness/05-14-13-crt-hill-testimony-re-the-americans-with-disabilities-act-and-entertain.201372314.pdf) (last accessed Dec. 5, 2017).

3.     Screen readers convert a website's text, buttons, links, and text fields to audio. Without screen reader programs, blind or visually impaired individuals cannot independently access the Internet, where everyday activities such as shopping, banking, research, and education have become commonplace.

4.     RE/MAX offers real estate brokerage services. The company operates a real estate network of franchisee owned and operated offices. RE/MAX provides real estate advice in the areas of home buying, home selling, mortgage, agent selection, title and escrow, foreclosure, short sales, home inspection, and forms and contracts.

5.     According to the RE/MAX Terms of Use, "[t]he goals of the Web Site include providing consumers with access to residential and commercial real estate listings, real estate related information, and information about RE/MAX, LLC. ("RE/MAX, LLC") and its global real estate system of independently-owned and -operated affiliates and their network of independent sales professionals." [2]

6.     RE/MAX offers these online services at its websites, www.remax.com and www.theremaxcollection.com ("Websites"), which it owns, operates, and controls.

7.     RE/MAX's Websites allow consumers to search homes for sale using various types of criteria, find RE/MAX offices and agents in their area, and obtain home estimates.

8.     Through the Websites, consumers may also create a personal account in which to manage their home search.

---

[2] *See* Terms and Conditions (available at https:// http://www.remax.com/corporate/terms-of-use/) (last accessed Dec. 5, 2017).

9.      Unfortunately, RE/MAX denies approximately 7 million[3] Americans who are visually impaired access to its Websites' goods, content, and services because the Websites are largely incompatible with the screen reader programs these Americans use to navigate an increasingly ecommerce world.

10.     Plaintiff brings this civil rights action against RE/MAX to enforce Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("Title III"), which requires, among other things, that a public accommodation (1) not deny persons with disabilities the benefits of its services, facilities, privileges and advantages; (2) provide such persons with benefits that are equal to those provided to nondisabled persons; (3) provide auxiliary aids and services—including electronic services for use with a computer screen reading program—where necessary to ensure effective communication with individuals with a visual disability, and to ensure that such persons are not excluded, denied services, segregated or otherwise treated differently than sighted individuals; and (4) utilize administrative methods, practices, and policies that provide persons with disabilities equal access to online content.

11.     By failing to make its Websites available in a manner compatible with computer screen reader programs, RE/MAX, a public accommodation subject to Title III, deprives blind and visually-impaired individuals the benefits of its online goods, content, and services—all benefits it affords nondisabled individuals—thereby increasing the sense of isolation and stigma among these Americans that Title III was meant to redress.

---

[3] Perkins School of the Blind (Watertown, MA), *America's Blind Spot: What's Preventing Us From Including Those Who Are Blind in the Sighted World?*, p. 5, *available at* http://www.perkins.org/sites/default/files/perkins-americas-blind-spot-ebook.pdf (last accessed December 4, 2017).

12.     Because RE/MAX's Websites have never been accessible and because RE/MAX does not have, and has never had, an adequate corporate policy that is reasonably calculated to cause its Websites to become and remain accessible, Plaintiff invokes 42 U.S.C. § 12188(a)(2) and seeks a permanent injunction requiring:

a)   that RE/MAX retain a qualified consultant acceptable to Plaintiff ("Mutually Agreed Upon Consultant") who shall assist it in improving the accessibility of its Websites so the goods and services on them may be equally accessed and enjoyed by individuals with vision related disabilities;

b)   that RE/MAX work with the Mutually Agreed Upon Consultant to ensure that all employees involved in website development and content development be given web accessibility training on a periodic basis, including onsite training to create accessible content at the design and development stages;

c)   that RE/MAX work with the Mutually Agreed Upon Consultant to perform an automated accessibility audit on a periodic basis to evaluate whether RE/MAX's Websites may be equally accessed and enjoyed by individuals with vision related disabilities on an ongoing basis;

d)   that RE/MAX work with the Mutually Agreed Upon Consultant to perform end-user accessibility/usability testing on a periodic basis with said testing to be performed by individuals with various disabilities to evaluate whether RE/MAX's Websites may be equally accessed and enjoyed by individuals with vision related disabilities on an ongoing basis;

e)   that RE/MAX work with the Mutually Agreed Upon Consultant to create an accessibility policy that will be posted on its Websites, along with an e-mail address and toll free phone number to report accessibility-related problems; and

f)   that Plaintiff, their counsel and its experts monitor each Website for up to two years after the Mutually Agreed Upon Consultant validates it is free of accessibility errors/violations to ensure RE/MAX has adopted and implemented adequate accessibility policies.

13.     Web-based technologies have features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible website will not cause the website to remain accessible without a corresponding change in corporate policies related to those web-based technologies. To evaluate whether an inaccessible website has been rendered accessible, and whether corporate policies related to web-based technologies have been changed

4

in a meaningful manner that will cause the website to remain accessible, the website must be reviewed on a periodic basis using both automated accessibility screening tools and end user testing by disabled individuals.

**JURISDICTION AND VENUE**

14.     The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

15.     RE/MAX purposefully targets and otherwise solicits business from Pennsylvania residents through its Websites. Because of this targeting, it is not unusual for RE/MAX to conduct business with Pennsylvania residents. In fact, the opposite is true: RE/MAX clearly does business over the Internet with Pennsylvania residents, having entered into contracts with Pennsylvania residents that involve the knowing and repeated transmission of computer files over the Internet. *See Gniewkowski v. Lettuce Entertain You*, Order, ECF No. 123 (W.D. Pa Apr. 25, 2017) *clarified by* Order of Court, ECF No. 169 (W.D. Pa. June 22, 2017) (Judge Schwab) (The court exercised personal jurisdiction over an out-of-forum defendant for claims its website is inaccessible to a visually disabled resident of the forum state.); *see also Access Now Inc. v. Otter Products, LLC*, Case No. 1:17-cv-10967-PBS (D.Mass. Dec. 4, 2017) (exercising personal jurisdiction over forum-based plaintiff's website accessibility claims against out-of-forum website operator).

16.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Plaintiff Brown's claims occurred.

**PARTIES**

17.     Plaintiff Brown is and, at all times relevant hereto, has been a resident of Allegheny County, Pennsylvania. Plaintiff Brown is and, at all times relevant hereto, has been legally blind

5

and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq.*

18.     Defendant, RE/MAX, LLC, is a Delaware Limited Liability Company with its principle place of business is located at 5075 S. Syracuse Street, Denver Colorado 80237. RE/MAX's Websites are a public accommodation pursuant to 42 U.S.C. § 12181(7).

## FACTS APPLICABLE TO ALL CLAIMS

19.     While the increasing pervasiveness of digital information presents an unprecedented opportunity to increase access to goods, content, and services for people with perceptual or motor disabilities, website developers and web content developers often implement digital technologies without regard to whether those technologies can be accessed by individuals with disabilities. This is notwithstanding the fact that accessible technology is both readily available and cost effective.

20.     Individuals with vision related disabilities may access websites using screen reader programs that convert text to audio. Screen reader software provides the primary method by which a blind person may independently use the Internet. Unless websites are designed to be read by screen reader software, individuals suffering visual impairments are unable to fully access websites and the content and services they make available.

## RE/MAX'S ONLINE CONTENT

21.     RE/MAX's Websites allow consumers to research homes by city, state, zip code, and/or county. Through the Websites, consumers may also research RE/MAX office locations and contact a local RE/MAX agent. For example, when a consumer enters "Pittsburgh, PA" at www.remax.com/officeagentsearch/, RE/MAX identifies 313 local RE/MAX agents and 29 local RE/MAX office locations. The www.remax.com website provides the address, phone number, and

fax number of each agent, and offers to connect consumers to an agent through the RE/MAX's online platform, directly.

22.     Consumers may use the Websites to connect with RE/MAX on social media, using sites like Facebook, LinkedIn, and Twitter.

23.     The Websites require consumers to read the RE/MAX Terms of Use before using RE/MAX's online services, and provide important information regarding RE/MAX's Privacy Policy.  The Websites also explain how consumers may contact RE/MAX by mail, phone, fax, and email.

## HARM TO PLAINTIFF

24.     Plaintiff Brown has attempted to use RE/MAX's Websites. Unfortunately, because of RE/MAX's failure to build its Websites in a matter that is compatible with screen reader programs, he is unable to understand, and thus is denied the benefit of, much of the content and services he wishes to access or use.

25.     Mr. Brown attempted to access the Websites with the same screen reader program he uses to browse the Internet, but found it to be largely unusable due to various accessibility barriers. For example:

(a)     Mr. Brown attempted to create a RE/MAX account. After he activated, or "clicked," the "My REMAX" button at www.remax.com, he encountered a popup dialogue box. Unfortunately, RE/MAX has not designed this pop up box to be perceived or operated with a screen reader. As a result, Mr. Brown's screen reader ignored this top layer of content, controlling only the window beneath the pop up box. In fact, Mr. Brown could not even close or "x out of" this pop up window with his screen reader.

(b)     The Websites use abbreviations that screen readers cannot read. For example, a sighted user may understand that "bd" and "ba" mean "bed" and "bath," respectively.

7

Unfortunately, a screen reader's phonetic pronunciation of this text is gibberish, frustrating users' search for a home.

(c)     Many pages lack proper headings and/or labels, making Mr. Brown's navigation of the Website an exercise of trial and error. For example, RE/MAX lists street addresses as H2, or as a second heading level, and the number of rooms/baths as H6, or as a sixth heading level. Using a screen reader, Mr. Brown does not know whether he is missing information between these two heading levels, or whether, for some reason, RE/MAX intentionally designed its search results pages to skip heading levels three, four, and five.

26.     As a result of visiting RE/MAX's Websites and from investigations performed on his behalf, Plaintiff is aware the Websites include at least the following additional barriers blocking his full and equal use:

(a)  The Websites do not provide a text equivalent for every non-text element;

(b)  The purpose of each link cannot be determined from the link text alone or from the link text and its programmatically determined link context;

(c)  Web pages lack titles that describe their topic or purpose;

(d)  Headings and labels do not describe topic or purpose;

(e)  Keyboard user interfaces lack a mode of operation where the keyboard focus indicator is visible;

(f)  The default human language of each web page cannot be programmatically determined;

(g)  The human language of each passage or phrase in the content cannot be programmatically determined;

(h)  Labels or instructions are not always provided when content requires user input;

8

(i)  Text cannot be resized up to 200 percent without assistive technology so that it may still be viewed without loss of content or functionality;

(j)  A mechanism is not always available to bypass blocks of content that are repeated on multiple web pages;

(k)  A correct reading sequence is not provided on pages where the sequence in which content is presented affects its meaning;

(l)  In content implemented using markup languages, elements do not always have complete start and end tags, are not nested according to their specifications, may contain duplicate attributes, and IDs are not always unique; and

(m) The name and role of all UI elements cannot be programmatically determined; things that can be set by the user cannot be programmatically set; and/or notification of changes to these items is not available to user agents, including assistive technology.

27.    These barriers, and others, deny Plaintiff full and equal access to all of the services the Websites offer, and now deter him from attempting to use the Websites and/or visit one of RE/MAX's many office locations. Still, Plaintiff would like to, and intends to, attempt to access RE/MAX's Websites in the future to research the products and services the Websites offer, or to test the Websites for compliance with the ADA.

28.    If the Websites were accessible, *i.e.* if RE/MAX removed the access barriers described above, Plaintiff could independently research homes and engage a RE/MAX agent, view RE/MAX's Policies, and contact customer service, via RE/MAX's Website.

29.    Though RE/MAX may have centralized policies regarding the maintenance and operation of its Websites, RE/MAX has never had a plan or policy that is reasonably calculated to make its Websites fully accessible to, and independently usable by, individuals with vision related

disabilities. As a result, the complained of access barriers are permanent in nature and likely to persist.

30.     The law requires that RE/MAX reasonably accommodate Plaintiff's disabilities by removing these existing access barriers. Removal of the barriers identified above is readily achievable and may be carried out without much difficulty or expense.

31.     Plaintiff's above request for injunctive relief is consistent with the work performed by the United States Department of Justice, Department of Transportation, and U.S. Architectural and Transportation Barriers Compliance Board (the "Access Board"), all of whom have relied upon or mandated that the public-facing pages of website complies with an international compliance standard known as Web Content Accessibility Guidelines version 2.0 AA ("WCAG 2.0 AA"), which is published by an independent third party known as the Worldwide Web Consortium ("W3C").[4]

32.     All parties have been, and in the absence of an injunction will continue to be, injured by RE/MAX's failure to provide its online content and services in a manner that is compatible with screen reader technology.

**RE/MAX'S KNOWLEDGE OF WEBSITE ACCESSIBILITY REQUIREMENTS**

33.     RE/MAX has long known that screen reader technology is necessary for individuals with visual disabilities to access its online content and services, and that it is legally responsible for providing the same in a manner that is compatible with these auxiliary aids.

34.     Indeed, the Disability Rights Section of the DOJ reaffirmed in a 2015 Statement of Interest before the United States District Court for the District of Massachusetts that it has been a "longstanding position" of the Department of Justice "that the ADA applies to websites of public

---

[4] Available at https://www.w3.org/) (last accessed Dec. 5, 2017).

accommodations." *See National Association of the Deaf v. Massachusetts Institute of Technology*, No. 3:15-cv-300024-MGM, DOJ Statement of Interest in Opp. To Motion to Dismiss or Stay, Doc. 34, p. 4 (D. Mass. Jun. 25, 2015) ("MIT Statement of Interest"); *see also National Association of the Deaf. v. Harvard University*, No. 3:15-cv-30023-MGM, DOJ Statement of Interest of the United States of America, Doc. 33, p.4 (D. Mass. Jun. 25, 2015) ("Harvard Statement of Interest").

## THE PARTIES HAVE NO ADMINISTRATIVE REMEDIES TO PURSUE

35.     There is no DOJ administrative proceeding that could provide Plaintiff with Title III injunctive relief.

36.     While DOJ has rulemaking authority and can bring enforcement actions in court, Congress has not authorized it to provide an adjudicative administrative process to provide Plaintiff with relief.

37.     Plaintiff alleges violations of existing and longstanding statutory and regulatory requirements to provide auxiliary aids or services necessary to ensure effective communication, and courts routinely decide these types of effective communication matters.

38.     Resolution of Plaintiff's claims does not require the Court to unravel intricate, technical facts, but rather involves consideration of facts within the conventional competence of the courts, *e.g.* (a) whether RE/MAX offers content and services on its Websites, and (b) whether Plaintiff can access the content and services.

## SUBSTANTIVE VIOLATION
## (Title III of the ADA, 42 U.S.C. § 12181 *et seq.*)

39.     The assertions contained in the previous paragraphs are incorporated by reference.

40.     RE/MAX's Websites are places of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7). *See Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, No. 16-cv-1898, 2017 WL 1437199, at *8-9 (W.D. Pa. Apr. 21, 2017) (Judge Schwab)

("Importantly, however, in both *Ford* and *Peoples*, the alleged discrimination occurred at a location where neither the insurance carrier in *Ford,* nor the credit card company in *Peoples,* had ownership or possession, or exercised control. Conversely, in the instant matter, the alleged discrimination has taken place on property that AmeriServ owns, operates and controls—the AmeriServ Website.").

41.     In the broadest terms, the ADA prohibits discrimination on the basis of a disability in the full and equal enjoyment of goods and services of any place of public accommodation. 42 U.S.C. § 12182(a). Thus, to the extent RE/MAX does not provide Plaintiff with full and equal access to its Websites, it has violated the ADA.

42.     In more specific terms, Title III of the ADA imposes statutory and regulatory requirements to ensure persons with disabilities are not excluded, denied services, segregated or otherwise treated differently than other individuals as a result of the absence of auxiliary aids and services. 42 U.S.C. § 12182(b)(2)(A); 28 C.F.R. §§ 36.303(a), (c). Under these provisions, public accommodations must furnish appropriate auxiliary aids and services that comply with their effective communication obligations. *Id.; see also* MIT Statement of Interest, p. 4; Harvard Statement of Interest, p. 4.

43.     Auxiliary aids and services are necessary when their absence effectively excludes an individual from participating in or benefiting from a service, or fails to provide a like experience to the disabled person.

44.     Auxiliary aids and services include, but are not limited to, audio recordings, screen reader software, magnification software, optical readers, secondary auditory programs, large print materials, accessible electronic and information technology, other effective methods of making

visually delivered materials available to individuals who are blind or have low vision, and other similar services and actions. 28 C.F.R. §§ 36.303(b)(2), (4).

45.    In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. §§ 36.303(c)(1)(ii). To this end, the Ninth Circuit has explained, "assistive technology is not frozen in time: as technology advances, [ ] accommodations should advance as well." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011).

46.    By failing to provide its Websites' content and services in a manner that is compatible with auxiliary aids, RE/MAX has engaged, directly, or through contractual, licensing, or other arrangements, in illegal disability discrimination, as defined by Title III, including without limitation:

(a)    denying individuals with visual disabilities opportunities to participate in and benefit from the goods, content, and services available on RE/MAX's Websites;

(b)    affording individuals with visual disabilities access to RE/MAX's Websites that is not equal to, or effective as, that afforded others;

(c)    utilizing methods of administration that (i) have the effect of discriminating on the basis of disability; or (ii) perpetuate the discrimination of others who are subject to common administrative control;

(d)    denying individuals with visual disabilities effective communication, thereby excluding or otherwise treating them differently than others; and/or

(e)      failing to make reasonable modifications in policies, practices, or procedures where necessary to afford its services, privileges, advantages, or accommodations to individuals with visual disabilities.

47.     RE/MAX has violated Title III by, without limitation, failing to make its Websites' services accessible by screen reader programs, thereby denying individuals with visual disabilities the benefits of the Websites, providing them with benefits that are not equal to those it provides others, and denying them effective communication. *See Gniewkowski v. Lettuce Entertain You*, 2017 WL 1437199, at *8-9 ("This Court finds that because AmeriServ owns, operates, and controls the property through which persons access its services, this matter is distinguishable from the *Ford* and *Peoples* cases. This Court also finds that the allegations set forth in Plaintiff's Complaint establish that the alleged discrimination—Plaintiffs' inability to access financial services information—took place at a property that AmeriServ owns, operates, and controls. Accordingly, the Court will deny AmeriServ's 12(b)(6) Motion because Plaintiffs have properly pled a legally cognizable claim under Title III of the ADA.").

48.     RE/MAX has further violated Title III by, without limitation, utilizing administrative methods, practices, and policies that allow its Websites to be made available without consideration of consumers who can only access the company's online goods, content, and services with screen reader programs.

49.     Making its online goods, content, and services compatible with screen reader programs does not change the content of RE/MAX's Websites or result in making the Websites different, but rather enables individuals with visual disabilities to access the Websites RE/MAX already provides. *See* MIT Statement of Interest, p. 20; *see also* Harvard Statement of Interest, p. 20.

50.     RE/MAX's ongoing and continuing violations of Title III have caused, and in the absence of an injunction will continue to cause, harm to Plaintiff and other individuals with visual disabilities.

51.     Plaintiff's claims are warranted by existing law or by non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

52.     Pursuant to 42 U.S.C. § 12188 and the remedies, procedures and rights set forth and incorporated therein, Plaintiff requests relief as set forth below.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for:

53.     A Declaratory Judgment that at the commencement of this action RE/MAX was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that RE/MAX took no action that was reasonably calculated to ensure that its Websites are fully accessible to, and independently usable by, individuals with visual disabilities;

54.     A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs RE/MAX to take all steps necessary to bring its Websites into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that its Websites are fully accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that RE/MAX has adopted and is following an institutional policy that will in fact cause RE/MAX to remain fully in compliance with the law—the specific injunctive relief requested by Plaintiff is described more fully in paragraph 12 above.

55.     Payment of costs of suit;

56.    Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment (*see Hadix v. Johnson*, 143 F.3d 246 (6th Cir. 1998), *aff'd in part, rev'd in part*, 527 U.S. 343 (1999); *Jenkins v. Missouri*, 127 F.3d 709 (8th Cir. 1997); *Walker v. U.S. Dep't of Hous. & Urban Dev.*, 99 F.3d 761 (5th Cir. 1996); *Stewart v. Gates*, 987 F.2d 1450, 1452 (9th Cir. 1993) (district court should permit compensation for the post judgment monitoring efforts by the plaintiff's counsel that are "useful and necessary to ensure compliance with the court's orders"); *Garrity v. Sununu*, 752 F.2d 727, 738-39 (1st Cir. 1984); *Adams v. Mathis*, 752 F.2d 553 (11th Cir. 1985); *Willie M. v. Hunt*, 732 F.2d 383, 385, 387 (4th Cir. 1984); *Bond v. Stanton*, 630 F.2d 1231, 1233-34 (7th Cir. 1980); *Northcross v. Board of Educ.*, 611 F.2d 624, 637 (6th Cir. 1979) ("Services devoted to reasonable monitoring of the court's decrees, both to ensure full compliance and to ensure that the plan is indeed working . . . are essential to the long-term success of the plaintiff's suit.") (citing 3rd Circuit's support for District Court's award of prospective fees to plaintiff's counsel); and

57.    The provision of whatever other relief the Court deems just, equitable and appropriate.

Dated: December 5, 2017                         Respectfully Submitted,


                                                */s/ Benjamin J. Sweet*
                                                Benjamin J. Sweet (PA Bar No. 87338)
                                                bsweet@carlsonlynch.com
                                                Kevin W. Tucker (PA Bar No. 312144)
                                                ktucker@carlsonlynch.com

                                                **CARLSON LYNCH SWEET KILPELA**
                                                **& CARPENTER, LLP**
                                                1133 Penn Avenue, 5th Floor
                                                Pittsburgh, PA 15222
                                                Phone: (412) 322.9243

                                                *Counsel for Plaintiff*

16